**FILED**

MAY 0 9 2017

CLERK

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| DENISE LIGHTNING FIRE, ON BEHALF OF AND AS LEGAL GUARDIANS OF S C , A MINOR CHILD, WAKIYAN PETA, ON BEHALF OF AND AS LEGAL GUARDIANS OF S C , A MINOR CHILD, S C , A MINOR CHILD, AARON D EIESLAND, ON BEHALF OF AND AS GUARDIANS AD LITEM OF S C , A MINOR CHILD, AND JAMES CERNEY, ON BEHALF OF AND AS GUARDIANS AD LITEM OF S C , A MINOR CHILD, <br><br> Plaintiffs, <br><br> vs <br><br> UNITED STATES OF AMERICA, <br><br> Defendant | 3 15-CV-03015-RAL <br><br><br> OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS |

Plaintiffs Denise Lightning Fire and Wakiyan Peta are the legal guardians of S C , a minor child, Plaintiffs Aaron D Eiesland and James Cerney are the guardians ad litem for S C (collectively Plaintiffs)  The Plaintiffs have sued the United States under the Federal Tort Claims Act (FTCA), 28 U S C §§ 1346(b), 2671–2680, alleging that the negligence of a federal employee caused S C to be burned by hot oil while cooking frybread at the Cheyenne-Eagle Butte School  Doc 1  The United States filed an answer admitting that S.C was injured while using hot oil, but denying liability  Doc 7  The United States then filed a motion to dismiss for

1

lack of jurisdiction under Rule 12(h)(3),[1] or in the alternative, a motion for summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure  Doc 19  Plaintiffs opposed the United States' motions, and both parties submitted additional materials outside the pleadings Docs. 21–23, 28–31, 32–33.  For the reasons explained below, this Court grants Defendant's motion to dismiss

## I.  Facts of Incident and Pleadings

The facts of this case are relatively uncontested and straightforward  On January 17, 2014, S C was a student attending the Cheyenne-Eagle Butte School on the Cheyenne River Indian Reservation and participating in her home economics class,[2] learning how to make stuffed frybread  Doc 1 at ¶ 7  As S C was putting her piece of frybread into the hot oil, water on the fork contacted the hot oil and caused the oil to spatter onto her hand, wrist, neck and face  Doc 1 at ¶ 8  After S C screamed in pain, her teacher, Peggy Henson, began running cold water over the burns and notified the school office  Doc 1 at ¶ 9  S C was taken to the Eagle Butte Indian Health Services facility for treatment  Doc 1 at ¶ 10

Plaintiffs presented an administrative claim for S C 's injuries, pain and suffering, and emotional distress to the Bureau of Indian Affairs (BIA) and the Superintendent of the Cheyenne River Sioux Tribe in September 2014, and an administrative claim to the Bureau of Indian Education (BIE) and the Cheyenne-Eagle Butte School in January 2015  Doc 1 at ¶¶ 4–5  In March 2015, Plaintiffs' administrative claim was denied  Doc 1 at ¶ 6  In September 2015,

---

[1] The United States' motion to dismiss, Doc 19, moves to dismiss under Rule 12(h)(1) of the Federal Rules of Civil Procedure, which involves the waiver of affirmative defenses, but the accompanying pleading, Doc 20, and the reply, Doc 32, identify Rule 12(h)(3) as the grounds for dismissal based on a lack of subject matter jurisdiction

[2] S C 's class appears to be titled "Family and Consumer Science (FACS)," but is known throughout the depositions and in common parlance as a home economics class, or a nutrition and wellness class

Plaintiffs filed this claim under the FTCA, requesting damages for S C 's physical pain, loss of enjoyment of life, mental and emotional suffering, past and future medical expenses, prejudgment interests, costs and attorney's fees, as well as any other relief this Court may order Doc 1 at 7

The United States answered the Complaint, admitting that S.C was injured with hot oil during her class, but denying that S C 's teacher, Henson, was a federal employee Doc 7 at ¶¶ 7–8 The United States then filed a motion to dismiss or alternatively a motion for summary judgment Doc 19 The motion to dismiss argued that Henson was not a federal employee for purposes of the FTCA, so this Court did not have subject matter jurisdiction over the Plaintiffs' complaint Doc 20 at 12 The motion for summary judgment argued in the alternative that if this Court found Henson to be a federal employee, her conduct was protected under the discretionary function exception to the FTCA Doc 20 at 20 In accord with Local Rule 56 1, the United States' motion for summary judgment was accompanied by a statement of undisputed material facts, as well as supporting documents and affidavits Docs 21–23 These contained statements and facts relevant to both the jurisdictional issue framed by the motion to dismiss and the FTCA issue in the motion for summary judgment The Plaintiffs filed a memorandum in opposition to the motion to dismiss or motion for summary judgment, a response to the United States' statement of material facts, their own statement of disputed material facts, and supporting documents Docs 28–31 Like the United States' materials, these contained statements and facts relevant to both the motion to dismiss and the motion for summary judgment The United States then filed a reply along with additional supporting documents Docs 32–33

## II.　　Motion to Dismiss Standard under Rule 12(h)(3)

The United States asserts lack of federal court subject matter jurisdiction and has moved to dismiss under Rule 12(h)(3) of the Federal Rules of Civil Procedure  Doc 19, Doc 20 at 8–9  Under Rule 12(h)(3),"[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action " Fed R Civ. P. 12(h)(3)  A Rule 12(h)(3) motion to dismiss is analyzed under the same standards as a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction  See Gates v Black Hills Health Care Sys (BHHCS), 997 F Supp 2d 1024, 1029 (D S D 2014) (citing Berkshire Fashions, Inc v M V Hakusan II, 954 F 2d 874, 879 n 3 (3rd Cir 1992))  A Rule 12(h)(3) motion differs from a Rule 12(b)(1) motion only in that it can be brought at any time, by any party or interested individual, or *sua sponte* by the court, a Rule 12(b)(1) motion must be made before any responsive pleading  See Fed R Civ P  12(b) ("A motion asserting any of these defenses must be made before pleading if a responsive pleading is allowed "), 5B Charles Alan Wright et al , Federal Practice & Procedure § 1350 (3d ed )

"In order to properly dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the complaint must be successfully challenged on its face or on the factual truthfulness of its averments " Titus v Sullivan, 4 F 3d 590, 593 (8th Cir 1993).  In any case, "[t]he burden of proving subject matter jurisdiction falls on the plaintiff " V S Ltd P'ship v Dep't of Hous & Urban Dev, 235 F 3d 1109, 1112 (8th Cir 2000), see also Barnes v United States, 448 F.3d 1065, 1066 (8th Cir 2006) (explaining the sovereign immunity of the United States, but "if the plaintiff shows that the government has unequivocally waived that immunity," the case can be heard)  A facial challenge is limited to the allegations in the plaintiffs' complaint, and the court must view the allegations in the light most favorable to the plaintiffs  Stalley v Catholic Health

Initiatives, 509 F 3d 517, 521 (8th Cir. 2007) "The plaintiff must assert facts that affirmatively and plausibly suggest that the pleader has the right he claims (here, the right to jurisdiction), rather than facts that are merely consistent with such a right " Id In contrast, where a factual attack is made on the court's subject matter jurisdiction, because "its very power to hear the case" is at issue, "the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case," without transforming the motion into one for summary judgment. Osborn v United States, 918 F 2d 724, 730 (8th Cir 1990) (quoting Mortensen v First Fed Sav & Loan Ass'n, 549 F 2d 884, 891 (3rd Cir 1977)), see also Gould, Inc v Pechiney Ugine Kuhlmann, 853 F 2d 445, 451 (6th Cir 1988) ("When a challenge is to the actual subject matter jurisdiction of the court, as opposed to the sufficiency of the allegation of subject matter jurisdiction in the complaint which may be cured by an amendment to the pleading, the district court has the power to resolve any factual dispute regarding the existence of subject matter jurisdiction.") In a factual attack on a court's jurisdiction, "the court considers matters outside the pleadings, and the non-moving party does not have the benefit of [Rule] 12(b)(6) safeguards " Osborn, 918 F 2d at 729 n 6 (internal citation removed)

Although the United States does not state whether its Rule 12(h)(3) motion is a facial or factual challenge, it has quoted only the language from Osborn that refers to a factual challenge under Rule 12(b)(1) Doc. 20 at 8–9 (quoting Osborn, 918 F 2d at 730) It has included a factual background statement section for its combined motions, Doc 20 at 3, and alleges throughout its pleadings "that the jurisdictional allegations of the complaint [are] not true," Kerns v United States, 585 F 3d 187, 192 (4th Cir 2009) (alteration in original) (internal quotation removed) See Doc 20 at 20 ("Henson is not a federal employee ") Further suggesting a factual attack

5

on this Court's jurisdiction, the United States has filed supporting exhibits regarding the jurisdictional issue that are not referenced in the Complaint  Docs 22-2, 22-4, 22-6

The Plaintiffs likewise did not identify what standard applies to this challenge to subject matter jurisdiction in their response  See Doc 28 at 2–3.  However, the Plaintiffs' response to the United States' statement of undisputed material facts includes specific admissions and denials relating to the jurisdictional question  See Doc 29 at 1–12  In addition, the affidavits, depositions, and exhibits filed by the Plaintiffs address both the question of the existence of any underlying negligence causing S C 's injury, and the question of whether Henson is a federal employee under the FTCA  See, e g , Doc 31-1, Docs 28–31  Plaintiffs therefore have had the opportunity to present facts by affidavit and deposition consistent with their burden of establishing subject matter jurisdiction in response to a factual Rule 12(b)(1) motion to dismiss  See Osborn, 918 F 2d at 730 (explaining that a court may hold an evidentiary hearing on the issue of jurisdiction, that "motion may be supported with affidavits or other documents," and "[if] necessary, the district court can hold a hearing at which witnesses may testify," because there is no required format for such a hearing, "'any rational mode of inquiry will do'" (quoting Crawford v United States, 796 F 2d 924, 929 (7th Cir 1986))), Titus, 4 F 3d at 593 (explaining that in a factual attack on jurisdiction, "the court may receive competent evidence such as affidavits, deposition testimony, and the like in order to determine the factual dispute"), Johnson v United States, 534 F 3d 958, 964 (8th Cir 2008) (upholding dismissal where the district court ruled on the government's 12(b)(1) motion without holding an evidentiary hearing where neither party requested such a hearing and "the parties had ample opportunity to be heard through affidavits and briefs"), Gould, 853 F 2d at 451, Mortensen, 549 F.2d at 892 n.18 ("[T]he record must clearly establish that after jurisdiction was challenged the plaintiff had an opportunity to

6

present facts by affidavit or by deposition, or in an evidentiary hearing, in support of his jurisdictional contention ") Although some material facts may remain in dispute,[3] "the material facts in dispute are relevant to the 'question of actual negligence' and not as to whether subject matter jurisdiction exists," <u>Moyer Packing Co v United States</u>, 567 F Supp. 2d 737, 749 (E D. Penn 2008), and thus no evidentiary hearing is required

Those disputed issues of material fact as identified by the Plaintiffs do not need to be settled to determine whether subject matter jurisdiction exists because they are not inextricably entwined with the jurisdictional issue See <u>Osborne</u>, 918 F 2d at 730 ("In the case before us, the statute of limitations inquiry is clearly severable from the merits of the [plaintiffs'] claim "), <u>Iowa League of Cities v E P A</u>, 711 F 3d 844, 861 (8th Cir 2013) (proceeding to evaluate the merits of a jurisdictional claim although disputed material facts existed (quoting <u>Osborn</u>, 918 F 2d at 729–30 & n 6)) The Eighth Circuit has deemed that even the question of whether an employee was acting within the scope of their federal employment when the alleged act of negligence occurred is not enough to necessitate a full trial on the merits to resolve the jurisdictional question See <u>Johnson</u>, 534 F 3d at 964 ("[G]enerally, whether an employee's actions are within the scope of their employment is a question of fact, [but] we fail to see how the factual nature of this inquiry somehow renders the jurisdictional issue so bound up with the merits that a full trial on the merits is necessary to resolve the issue [W]hether Little Light's conduct was within the scope of his employment is unrelated to whether Little Light's conduct was negligent, which is the most important issue on the merits " (internal quotation and citation removed))

---

[3] The Plaintiffs have filed a "Statement of Issues Still in Dispute," containing seven statements that concern only the alleged negligence on the part of Henson and the administration of the Cheyenne-Eagle Butte High School, and the amount of damages S C has incurred Doc 30

In considering the supporting documents attached by both parties, this Court is not converting the United States' Rule 12(h)(3) motion into a Rule 56 motion for summary judgment, where different standards and burdens apply Instead, this Court considers only the material relevant to the jurisdictional question regarding whether Henson is a federal employee, not material relating to the underlying negligence question Only if this Court were to determine that Henson is a federal employee for FTCA purposes would it then consider the United States' motion for summary judgment under the Rule 56 standard This Court must resolve the United States' motion to dismiss under Rule 12(h)(3) first, because if it lacks the jurisdiction to hear the claim, it cannot proceed any further, such as to consider whether to grant summary judgment See Gesinger v Burwell, 210 F Supp 3d 1177, 1186 (D S D 2016) (citing Bell v Hood, 327 U S 678, 682 (1946))

### III. Discussion

#### A. FTCA Overview and "Employee of the Government" Standard

"The United States, as sovereign, is immune from suit save as it consents to be sued." United States v Sherwood, 312 U S 584, 586 (1941) Congress has the ability to waive the United States' sovereign immunity, and "prescribe the terms and conditions on which [the United States] consents to be sued, and the manner in which the suit shall be conducted " Mader v United States, 654 F 3d 794, 797 (8th Cir. 2011) (alteration in original) (quoting Beers v State, 61 U.S (20 How ) 527, 529 (1857)) In a case against the United States, the waiver of sovereign immunity defines the bounds of a court's jurisdiction See F D.I.C v Meyer, 510 U.S. 471, 475 (1994); United States v Navajo Nation, 537 U S 488, 502 (2003) (explaining that the United States' consent to suit is a "prerequisite for jurisdiction" (quoting United States v Mitchell, 463 U S 206, 212 (1983))

In 1946, Congress passed the FTCA, which makes the United States "liable to the same extent as a private party for certain torts of federal employees acting within the scope of their employment" United States v Orleans, 425 U S 807, 813 (1976) The FTCA was designed both to avoid the injustice of "having meritorious claims hitherto barred by sovereign immunity," and to avoid the additional burden that Congress had of "investigating and passing upon private bills seeking individual relief" United States v Muniz, 374 U S 150, 154 (1963) As relevant to this case, the FTCA waives sovereign immunity for "personal injury . caused by the negligent or wrongful act or omission of any employee of the government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred" 28 U S C § 1346(b)(1) Where an act under the FTCA occurs on Indian land, the "law of the place" is considered to be the state within which the land is located—in this case, South Dakota LaFramboise v Leavitt, 439 F 3d 792, 796 (8th Cir. 2006), see also Molzof v United States, 502 U S 301, 305 (1992) ("[T]he extent of the United States' liability under the FTCA is generally determined by reference to state law ")

The main issue presented by the United States' motion to dismiss is whether Henson is a federal employee for purposes of FTCA liability As defined in the FTCA, an "employee of the government" includes (1) "officers or employees of any federal agency, members of the military or naval forces of the United States, members of the National Guard while engaged in training or duty and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation," and (2) "any officer or employee of a Federal public defender organization " 28 U S.C § 2671 The question in this case is whether Henson is considered either an "employee[] of any federal

9

agency," or a "person[] acting on behalf of a federal agency in an official capacity." <u>Id</u> The FTCA specifically exempts independent contractors from liability. <u>See id</u> (noting that "federal agency" within the FTCA "does not include any contractor with the United States.") Whether an individual is a federal employee or independent contractor under the FTCA is a question of federal law. <u>See</u> <u>Logue v. United States</u>, 412 U.S. 521, 527 (1973). In differentiating federal employees from independent contractors, the Supreme Court has stated that "[a] critical element in distinguishing an agency from a contractor is the power of the Federal Government 'to control the detailed physical performance of the contractor.'" <u>Orleans</u>, 425 U.S. at 814 (quoting <u>Logue</u>, 412 U.S. at 528). Courts must "evaluate the extent to which the government has the power to supervise the individual's day-to-day operations." <u>Knudsen v. United States</u>, 254 F.3d 747, 750 (8th Cir. 2001) (citing <u>Orleans</u>, 425 U.S. at 814).

### B. The Cheyenne-Eagle Butte School District and its Employment of Henson

The United States federal government offers support for the education of American Indian students in various ways. The BIE operates 183 schools today for the education of American Indian students, the legacy of the day and boarding schools established during the assimilation era in American Indian policy in the nineteenth century. Fifty-eight of these schools are operated entirely through the federal government, where the BIE hires teaches, enrolls students, and funds the classroom, these are called "BIE schools." One-hundred-thirty of these schools are operated under contracts or grants with tribal governments, these are called "grant schools." These tribally run schools are operated either under the Tribally Controlled School Grants Act (TCSA), 25 U.S.C. § 2501 et seq., or under "638 contracts" from the Indian Self-Determination and Education Assistance Act of 1975 (ISDEAA), 25 U.S.C. § 5321 et seq. Both BIE schools and grant schools have the ability to operate under a cooperative agreement, upon

tribal request, between tribal governments, state school districts, and the BIE  See 25 U S C. § 2010(f); 25 C.F.R § 31 0   This provision allows for the implementation of "a cooperative agreement that is entered into between the tribe, the Bureau, the local school board, and a local public school district"  25 U S C § 2010(f)(1)(A)   Such a cooperative agreement can "encompass coordination of all or any part of   (A) The academic program and curriculum (B) Support services, including procurement and facilities maintenance, [and] (C) Transportation "  Id § 2010(f)(2).[4]  The statute does not "require equal expenditures, or an exchange of similar services, by the Bureau school and schools in the school district," but "[e]ach [cooperative] agreement entered into   shall confer a benefit upon the Bureau school commensurate with the burden assumed by the school "  Id § 2010(f)(3).  Public Law 101-512 imposes liability on the United States for the actions of tribes, tribal organizations, or Indian contractors, who, within the scope of their employment, operate a contract, grant agreement, or cooperative agreement under either the TCSA or the ISDEAA  Pub L No 101-512, § 314, 104 Stat 1915 (Nov. 5, 1990) (codified at 25 U S C A § 5321 Historical and Statutory Notes) These employees are, for purposes of the FTCA, considered to be federal employees   See Adams v Tunmore, No CV-05-270-FVS, 2006 WL 2591272, at *3 (E.D Wash Sept 8, 2006), Mentz v United States, 359 F Supp 2d 856, 860 (D N D 2005), Big Owl v United States, 961 F Supp 1304, 1307–08 (D S D 1997), see also Wide Ruins Cmty Sch , Inc v Stago, 281 F Supp 2d 1086, 1089 (D Ariz 2003) (after conversion from a BIE to a tribally operated school under the TCSA, "tort actions that were available against the school when it was a BIA school

---

[4] See Melody McCoy, Indian Education Legal Support Project  Cooperative Agreements in Indian Education, Native American Rights Fund (Oct 1998) (collecting large-scale cooperative agreements between both BIE and grant schools with public school districts, along with smaller-scope cooperative agreements for transportation, specific academic programs, sports, and special education)

are still available against the United States  In all other respects, the school is a tribal school fully subject to tribal law   .   [T]he only federal obligation after conversion is for claims that are otherwise within the scope of the Federal Tort Claims Act ")

The makeup of the Cheyenne-Eagle Butte School District, where S C  was injured, is relatively unique among school districts    Located in Eagle Butte, South Dakota, within the borders of the Cheyenne River Indian Reservation, the Cheyenne-Eagle Butte School District serves around 1,200 students.  Doc 21 at ¶¶ 1–2, Doc 29 at ¶¶ 1–2  The Cheyenne-Eagle Butte School District operates under the Cheyenne-Eagle Butte School Cooperative Agreement and Policies, authorized by 25 U S C  § 2010(f), which is an agreement between two entities  1) the BIE, Cheyenne River Agency Education Office, Cheyenne-Eagle Butte 95-561[5] School Board (BIE School Board) and 2) the Eagle Butte School District 20-1, Dewey County, South Dakota (public school district)   Doc 21 at ¶ 11, Doc 29 at ¶ 11, Doc. 22-2   In addition to the requirements of 25 U S C  § 2010(f), the Cooperative Agreement is governed by the regulations set out at 25 C F R  § 31, and made possible through 25 U S C  § 13, which authorizes the BIA to expend monies for the "[g]eneral support and civilization, including education," of American Indians, and 25 U S C  § 295, which grants the Secretary of the Interior and the Commissioner of Indian Affairs  the responsibility to supervise and direct the expenditure of funds "appropriated for school purposes among the Indians "  See Doc 22-2 at 1   The Cooperative Agreement states that the "95-561 and the District Board desire to enter into an agreement for the education of

---

[5] Quotations throughout this Opinion and Order from the Cooperative Agreement and other supporting documents refer to the BIE school as a "95-561 School "  This language comes from Public Law 95-561, which in part gave tribes and American Indian parents greater control over the education of American Indian children, including developing standards for education in BIA schools, and ensuring American Indian parents had the ability to be heard regarding their children's education in public school districts  See Pub. L  No  95-561, tit  XI, 92 Stat 2143 (Nov  1, 1978) (codified in part at 25 U S C  §§ 2001 et seq )

both elementary and secondary school pupils of the District and the 95-561 schools in which both Federal and District funds, facilities, equipment and other property shall be utilized " Doc 22-2 at 1  Due to the rural location of Eagle Butte, the Cooperative Agreement enables the BIE and public state school district to save resources by combining the education of American Indian and non-Indian students  See Doc 22-2 at 2 ("No distinction shall be made between Indian and non-Indian students in the receipt of general educational services at the Cheyenne-Eagle Butte School ")  At any time, both the public school district board and the BIE school board have the ability to terminate the Cooperative Agreement through written notice, which would end the Cooperative Agreement on June 30th of that academic year  Doc 22 at 4

The Cheyenne-Eagle Butte Schools are under the direction of the "Cheyenne-Eagle Butte Cooperative School Board," which is made up of seven members of the BIE school board, and seven members of the public school district school board  Doc 22 at 1  The Cooperative School Board holds meetings once a month, and the agenda for those meetings is prepared by the public school district Superintendent and the BIE School Supervisor  Doc 22-2 at 1–2  The Cooperative Board is responsible "for establishing all rules, regulations, and policies used to administrate the Cooperative school "  Doc 22-2 at 2  During general educational services, "[n]o distinction shall be made between Indian and non-Indian students," but the Cooperative Agreement does allow for specific programs to one or the other group "in accordance with Tribal, State or Federal law "  Doc. 22-2 at 2   The Cooperative Agreement requires a collaborative approach to the "scope and sequence of the K-12 curriculum," but states that "the respective parties will have budgetary control over their respective expenditures " Doc 22-2 at 3, Doc 21 at ¶ 16, Doc 29 at ¶ 16  The Cheyenne-Eagle Butte Schools receive both state and federal funding, proportional to the number of American Indian and non-Indian students

attending the school, determined by an annual count of students submitted to the BIE and the State of South Dakota  Doc 21 at ¶¶ 8–9, Doc 29 at ¶¶ 8–9   The Cheyenne-Eagle Butte Schools operate within one large building complex, but "the physical maintenance, operation, and upkeep" of the facilities is the responsibility of the entity that owns the facilities [6] Doc 22-2 at 3  The public school district and the BIE retain separate budgets, and can only spend money in accordance with their own respective policies. Doc. 22-2 at 3  In addition, "[t]he 95-561 and District Boards shall each be responsible for the acquisition, management, control and distribution of all property, materials and supplies needed for operation of their respective schools " Doc 22-2 at 3, <u>see also</u> Doc 22-5 (reminding Henson that her expenditures for home economics classes must be charged to the public school district, while her expenditures in relation to her role with the student council and as a class advisor must be charged to the BIE)

In personnel matters, the Cooperative Agreement states that "[n]o distinction shall be made between employees of the 95-561 School and the District pertaining to general matters of employment and supervision at the Cheyenne-Eagle Butte School," but "realizing that the employees of the 95-561 School and the employees of the District are subject to separate regulations and agreements " Doc 22-2 at 4  The Cooperative Agreement states that while the full Cooperative Board will review applications for new teachers and school personnel, the "School Board of the entity that is funding the position will vote on the recommendations " Doc 22-2 at 4  The Cheyenne-Eagle Butte School is staffed by both BIE and public school district employees, and employees from both the BIE and the public school district hold administrative

---

[6] Materials of record with this Court suggest a lack of clarity in any physical separation of the BIE school operation and the State District school operation  While the Cooperative Agreement requires separate facilities upkeep, deposition testimony suggests the arrangement is "separate schools, one big building," and that building as located on property owned by the BIA  Doc. 31-3 at 2

positions in the School Doc 21 at ¶¶ 10, 18, Doc 29 at ¶¶ 10, 18 In addition to keeping the salaries separate, each entity provides separate housing for its staff and administration Doc 21 at ¶¶ 23–25, Doc 29 at ¶¶ 23–25 The BIE and public school district employees have a different process for advancement, sign separate contracts, and are on different time schedules Doc 21 at ¶¶ 39–43, Doc 29 at ¶¶ 39–43, Doc 22-3 at 5

During the 2013–2014 school year, Henson had an employment contract with the public school district, and her salary was paid out of the public school district's budget. Doc 21 at ¶ 23, Doc 29 at ¶ 23, Doc 22-4 Henson lived in housing provided by the public school district Doc 21 at ¶ 24, Doc 29 at ¶ 24 The principal of the High School, a BIE employee, was Henson's direct supervisor,[7] but lacked the ability to make the decision to remove Henson from her position Doc 21 at ¶ 28–29, Doc 29 at ¶ 28–29 The principal had only a limited ability to discipline Henson, and the public school superintendent would need to get involved in anything beyond day-to-day matters regarding Henson Doc 21 at ¶ 38, Doc 29 at ¶ 38 The principal reviewed Henson's teaching and gave Henson performance evaluations Doc 22-3 at 7 Because Henson was hired by the public school district, however, the district's superintendent alone had the authority to make the major decisions regarding Henson, including hiring and firing Doc 21 at ¶ 29; Doc. 29 at ¶ 29 Henson's 2013–2014 contract with the public school district stated, "the employee is to work under the direction of the school district administration and, if so designated by the school district administration, under the direction of the BIA " Doc 22-4 Henson has held a separate contract with the BIE for the provision of services as an advisor to the student council and as a senior class advisor Doc 21 at ¶ 26, Doc 29 at ¶ 26

---

[7] Under the current cooperative agreement, public school district employees can only be supervised by other public school district employees, and BIE employees can only be supervised by other BIE employees See Doc 23 at ¶ 10, Doc 21 at ¶ 30, Doc 29 at ¶ 30 This is a change from the Cooperative Agreement in effect during the 2013–2014 school year

When S C was injured, Henson was teaching a home economics class funded through the State

of South Dakota as a career and technical education class, with concepts mandated by state

standards  Doc. 21 at ¶ 31; Doc 29 at ¶ 31  The supplies for the class were purchased from the

public school district's budget  Doc 21 at ¶ 32, Doc 29 at ¶ 32, Doc. 22-5 (letter reminding

Henson that supplies purchased in her student council and class advisor roles "are to be charged

to the BIE's account not the District's," and that "[o]nly FACS supplies are to be charged to the

[public] School District's account").  Because of the nature of the Cheyenne-Eagle Butte School

and Henson's position, the parties dispute whether Henson is a federal employee under the

FTCA

### C. Whether Henson is a Federal Employee Under the FTCA

The Plaintiffs' argument for Henson being a federal employee relies primarily on the text

of 28 U S.C  § 2671 and the district court case of <u>Adams v  Tunmore</u>, No  CV-05-270-FVS,

2006 WL 2591272 (E D  Wash. Sept. 8, 2006)  The Plaintiffs emphasize that under the FTCA,

"'federal employees' include 'persons acting on behalf of a federal agency in an official

capacity, temporarily or permanently in the service of the United States, with or without

compensation '"  Doc  28 at 3 (quoting 28 U S C  § 2671)  The Plaintiffs argue that "while the

state hired, and is paying Ms  Henson, her duties arise from the Government's duty to educate

S C  under federal law "  Doc  28 at 3   After discussing the history of American Indian

education, the Plaintiffs argue that "[t]he federal government is in essence inviting Mrs  Henson

to fulfill [its] duties, a right which it can terminate at any time "  Doc  28 at 5–6.  The Plaintiffs

compare Henson's role in the Cheyenne-Eagle Butte Schools to the situation that arose in

<u>Tunmore</u>   In <u>Tunmore</u>, the plaintiff was injured in a motor vehicle accident blamed on the

defendant   Doc  20 at 17, <u>Tunmore</u>, 2006 WL 2591272, at *1   The defendant was driving a

vehicle owned by the Colville Tribe at the time of the accident, and was employed as a Jesuit Volunteer at the Pascal Sherman Indian School on the Confederated Tribes of the Colville Reservation  Id  The Pascal Sherman Indian School is operated by the Colville Tribe through a grant from the BIA under the TCSA  Id  For her employment at the school, the defendant received $78 per month, which was paid from the Colville Tribe's general fund, rather than from money that came from the TCSA  Id  at *3  The court referenced the applicability of Public Law No  101-512, which addresses "the performance of functions" under a grant authorized by the TCSA  Id  Although the defendant was not paid directly from money under the TCSA, because she was performing the function of educating American Indian students at the school, the court found that under Public Law No  101-512, she was considered to be an employee of the BIA, and thus a federal employee for purposes of the FTCA  Id  In particular, the court stated that the "source of Ms  Tunmore's stipend is legally immaterial to whether Ms  Tunmore was performing functions under a TCSA Grant " Id.

Plaintiffs urge this Court to adopt the approach of the Tunmore court, thereby deeming the source of Henson's pay to be immaterial, because her duties relate to the federal government's responsibilities to educate American Indian children  Doc 28 at 3  Because of the difference in how the Cheyenne-Eagle Butte School District operates, application of the Tunmore decision to deem Henson a federal employee would stretch Tunmore past its holding  Unlike the Pascal Sherman Indian School in Tunmore, the Cheyenne-Eagle Butte High School is not operated under the TCSA or the ISDEAA  The public information from the BIE classifies the Cheyenne-Eagle Butte Schools as "BIE," rather than "grant" schools.  See Bureau of Indian Educ  Nat'l Directory, U S  Dep't of Interior, at 37 (Feb  2017)  If the school in Tunmore had not been operated under the TCSA or the ISDEAA, it would not have fallen within the gambit of

·

Public Law No 101-512, which treats tribal employees as federal employees for purposes of the FTCA Likewise, in the two other cases most factually similar to this one, the operated under the TCSA, making Public Law 101-512 applicable  See Mentz v United States, 359 F Supp 2d 856, 859 (D N D 2005) (finding that auto mechanics instructor at the Standing Rock Community Grant School, which was operated through an agreement under the TCSA by the Standing Rock Sioux Tribe, was a federal employee under the FTCA through the application of Public Law No 101-512), Big Owl v United States, 961 F Supp 1304, 1308 (D S D 1997) (school board members of the Porcupine Day School, operated by the Oglala Sioux Tribe pursuant to a grant from the TCSA, considered employees of the BIA for FTCA purposes through Public Law No 101-512), see also Big Crow v Rattling Leaf, 296 F Supp 2d 1067, 1070 (D S D 2004) (finding that tribal law enforcement officer paid under one self-determination contract, but performing functions under a separate self-determination contract was a covered federal employee under Public Law No 101-512)  Because the Cheyenne-Eagle Butte Schools are not operated under the TCSA or the ISDEAA, Public Law No 101-512 does not apply  Henson is not considered a BIA employee for FTCA purposes by virtue of her "performance of functions" under a qualifying program, so she is not an "officer[] or employee[] of any federal agency" under 28 U S C § 2671

Section 2671 also extends liability under the FTCA for torts by "persons acting on behalf of a federal agency in an official capacity    whether with or without compensation " Plaintiffs' next argument that Henson is a federal employee concerns this language  Plaintiffs argue that the plain language of the FTCA qualifies Henson as a federal employee, regardless of being on the public school district payroll, because she is a "person[] acting on behalf of a federal agency

in an official capacity, temporarily or permanently in the service of the United States, with or without compensation." Doc 28 at 3 (quoting 28 U S C § 2671)

In Logue v United States, 412 U S 521 (1973), the Supreme Court interpreted this "acting on behalf of" language of § 2671 The Supreme Court in Logue, in discussing the applicability of the independent contractor exemption,[8] stated.

> [W]e are not persuaded that employees of a contractor with the Government, whose physical performance is not subject to governmental supervision, are to be treated as 'acting on behalf of' a federal agency simply because they are performing tasks that would otherwise be performed by salaried employees of the Government. If this were to be the law, the exclusion of contractors from the definition of 'Federal agency' in [§] 2671 would be virtually meaningless, since it would be a rare situation indeed in which an independent contractor with the Government would be performing tasks that would not otherwise be performed by salaried Government employees

Id at 531–32 The argument raised by Plaintiffs in discussing the federal government's duties to educate American Indian children is similar to the argument discussed and foreclosed by the Supreme Court in Logue. Even if "[t]he federal government is in essence inviting Mrs Henson to fulfill [its] duties," Doc 28 at 6, Logue states that "performing tasks that would otherwise be performed by salaried employees of the Government" does not automatically transform an individual into a federal employee, 412 U S at 531

Other courts have considered the broad question of whether someone working with, or in close proximity to, tribal entities and employees is properly considered a federal employee under the FTCA "The Supreme Court in Orleans held that the power to control is pivotal in determining whether an individual is an employee of the United States for the purposes of the FTCA The Court emphasized that federal funding or policing of federal standards and

---

[8] In their arguments, both parties rely on the substance, if not always the name, of the independent contractor exemption to determine whether Henson is a federal employee See Orleans, 425 U S at 815, Doc 20 at 19, Doc 28 at 5–6

regulations does not create employee status  The question to be answered is whether 'day-to-day operations are supervised by the Federal Government '" Bernie v. United States, 712 F 2d 1271, 1273 (8th Cir 1983) (internal citations removed) (quoting Orleans, 425 U S at 815)  In Bernie, the Eighth Circuit determined that two physicians treating Indian Health Service (IHS) patients were independent contractors and not federal employees because they were employed by separate medical entities, and those entities contracted with the IHS for services and paid the physicians their salaries.  Id  Because "IHS did not exercise control over nor dictate medical judgment" during the provision of health services, the physicians were deemed not to be federal employees  Id ; see also Knudsen, 254 F 3d at 750–51 (affirming district court decision that mental health counselor was an independent contractor, rather than an employee of Veterans Affairs for FTCA purposes, because the counselor "was not subject to any day-to-day control by the VA and was told not to maintain records for the VA's review," and the fact that Congress "expected the VA to insure that quality work was done with government funds" did not change employee's status); Summa v United States, No  90-2140, 1991 WL 114638, at *3 (10th Cir June 25, 1991) (tribal employee implementing a Summer Youth Employment Training Program funded under the federal Job Training Partnership Act was not a federal employee under the FTCA because "the federal government did not supervise the day-to-day operations of the tribal program" and regulations governing program specifically stated "Participants shall not be deemed Federal employees"), Coffey v United States, 906 F  Supp  2d 1114, 1165 (D N M 2012) (finding that local detention center was independent contractor, not federal agency, where it provided care for American Indian inmates, but the procurement contract did not "control the detailed physical conduct" of the detention center, and although the detention center was

required to comply with federal regulations and requirements, it had the ability to "decide for itself" how to comply with those regulations and requirements)

In Thompson v United States, 504 F Supp 1087 (D S D 1980), the court analyzed whether a tribal police officer in training was a federal employee under § 2671, rather than § 2680(h), which involves the status of "investigative or law enforcement officer " See, e g , Locke v United States, No 02-3152, 2003 WL 21212167 (8th Cir May 27, 2003) (per curiam), LaValle v United States, 396 F Supp 2d 1082 (D N D 2005) Although the officer in Thompson was hired by the Crow Creek Tribal Council, paid a salary from the Tribe, and the Tribal Council had the ability to fire the officer, the court determined he "unquestionably emerges as a full-fledged FTCA 'government employee,'" because of the officer's day-to-day working environment Id at 1089 As required by Orleans, the court looked not only to the source of the officer's compensation, but also the day-to-day control that the federal government had over the officer Id The court found that the applications for the tribal police officer position were submitted to the BIA police captain; the officer's indoctrination, oath, and gun all came from BIA officials, the officer was headquartered at the BIA police station, the officer's duties and shifts were determined by BIA supervisors, tribal officers were often considered as potential BIA officers, trainees were often cross-deputized as BIA officers, and BIA officials had the ability to fire the trainees in case of misbehavior Id at 1089–90 These factors made the court determine that the tribal officer was a federal employee within the meaning of the FTCA Id at 1089–90

During the 2013–2014 school year, Henson's day-to-day supervisor in the school where she taught American Indian and non-Indian children was a BIE employee, this is the main fact supporting an argument that Henson should be considered a federal employee under the FTCA

21

As it is the "power to control" that creates a federal employee under the FTCA, this Court must consider "whether 'day-to-day operations are supervised by the Federal Government '" Bernie, 712 F 2d at 1273 (quoting Orleans, 425 U S at 815) The BIE principal oversaw her teaching, gave her performance evaluations, and in concert with the language of the Cooperative Agreement, treated her no differently than BIE teachers Doc 21 at ¶¶ 28–29, Doc 29 at ¶¶ 28–29, Doc 22-2 at 4, Doc 22-3 at 7 However, unlike the tribal police officer in Thompson, 504 F Supp at 1089, in all other respects Henson was an employee of the state public school district, not the BIE Henson's employment contract was with the public school district, and her salary was paid out of the public school district's budget Doc 21 at ¶ 23, Doc 29 at ¶ 23, Doc 22-4 Henson lived in housing provided by the public school district Doc 21 at ¶ 24, Doc 29 at ¶ 24 Only the district's superintendent had the ability to make the major decisions regarding Henson's employment, including hiring and firing Doc 21 at ¶ 29; Doc. 29 at ¶ 29 Henson's 2013–2014 contract with the public school district specifically states her limited role with BIE employees, as prescribed by the public school district· "the employee is to work under the direction of the school district administration and, if so designated by the school district administration, under the direction of the BIA," and the Cooperative Agreement delineates the required separation between the two entities Docs 22-2, 22-4 As further evidence of the separation of her public school district and BIE roles, Henson has held a separate contract with the BIE for the provision of services as an advisor to the student council and as a senior class advisor Doc 21 at ¶ 26, Doc 29 at ¶ 26 The class that Henson was teaching when S C was injured, however, was funded by the state, had concepts mandated by state standards, used supplies purchased from the public school district's budget, and apparently had a mix of non-Indian and American Indian students See Doc 21 at ¶¶ 31–32, Doc 29 at ¶¶ 31–32, Doc 22-1 at 3, Doc 22-5, Doc 20 at

18, Doc 31-3 at 3, Doc 22-3 at 9–10 While the daily supervision of Henson during this time was done by a BIE employee, her job duties and responsibilities were all within the physical control and under the regulations and standards of the public school district and the state of South Dakota The issue is a close and fairly debatable one Given how the Cheyenne-Eagle Butte Schools were structured, and Henson's status there, Henson was not a federal employee under the FTCA when teaching the home economics class Therefore, this Court lacks subject matter jurisdiction under the FTCA over the Complaint

IV.    **Conclusion**

Because the United States' motion to dismiss for lack of subject matter jurisdiction is being granted, this Court need not consider the arguments made in the motion for summary judgment on the question of Henson's and the Cheyenne-Eagle Butte Schools' alleged negligence resulting in S C 's injuries. The motion for summary judgment is moot. For the reasons stated above, it is hereby

ORDERED that the Defendant's Motion to Dismiss is granted, Doc 19, and the Defendant's motion for summary judgment, Doc 19, is deemed moot

DATED this 9th day of May, 2017

BY THE COURT

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE